Thank you, Your Honors. May it please the Court, I'm Christopher Wright, representing ten petitioners, including the Ad Hoc Telecommunications Users Committee. The members of Ad Hoc, like most companies today, need sophisticated business data services, or BDS. The other nine petitioners on Ad Hoc's brief are telecommunications carriers who seek to provide those services. It's a complicated group this morning. There's another group of petitioners, the Citizens Telecom petitioners, and the main thing I'd like to make clear is that our positions are dramatically different. In addition, a group of intervenors led by AT&T are supporting the FCC today. Both the Citizens Telecom petitioners and the AT&T intervenors are incumbent local exchange carriers, or AT&T-franchised monopolists in the regions that they serve, and as a result they have ubiquitous networks in those regions. And the problem is this. The competitor carriers I'm representing have extensive intercity networks and fiber rings around most major cities and many smaller cities, but there are more than a million buildings in the country that need business data services, and my clients have facilities comparable to the major veins and arteries in the human body, but the ILACs have almost all the capillaries. There's an important distinction to get clear at the start. There's a big difference between high bandwidth BDS and low bandwidth BDS. High bandwidth BDS is highly remunerative. It makes sense for our clients economically to deploy capillaries, to deploy the last mile facilities into buildings to serve clients with high bandwidth needs, but low bandwidth is a different matter. The costs there are often merely in the hundreds of dollars a month, and unlike the ILACs, for us to reach those buildings we would have to trench roads and get permission to enter buildings and make modifications in buildings that just aren't economically justifiable. So the competitors have to buy last mile facilities to provide BDS from the ILACs. It's undisputed that the ILACs, under Section 201 of the Communications Act, the FCC is supposed to ensure that the ILACs rates are just and reasonable for those services. We have five issues, but I'd like to begin with the most complicated issue, which involves channel terminations. They are the very last, last mile facility. There's some transport after the major arteries and veins, but the channel terminations are the lines that actually go into the customer location. It is undisputed that the ILAC is the only carrier with channel terminations into 86% of buildings with demand for low bandwidth BDS, 86%. That 13% of low bandwidth buildings are served by only the ILAC and one competitive provider, and only 1% of locations with low bandwidth demand are served by three or more carriers. But in the order at issue, the FCC promulgated a competitive market test that deemed ILACs rates competitive in more than 90% of low bandwidth locations on the theory that competition will restrain the ILAC buildings. On its face, such a conclusion seems outlandish, and it is. The FCC's test relies on competition from what it calls nearby potential competitors, but those competitors are imaginary. The FCC's test has two prongs. The first prong considers nearby potential competition from telecommunications carriers such as my clients, and this prong deems an entire county to be competitive if 50% of business locations in the county are within half a mile of a competitive carrier. The fatal flaw here is that the prong is not limited to competition from providers of low bandwidth BDS. The commission counts providers of high bandwidth services as competitors of BDS. It is one thing to deploy facilities to provide high bandwidth services, and it is quite another to provide low bandwidth services. As I understand, the commission, I'll let them address this, but somewhat of an inconsistent position in the sense that they do not say that cable is a direct competitor of BDS for BDS services, but then does imply that, in fact, it is a competitor for BDS services because there are a lot of people, as I, if I understand what they're saying, there are a lot of small businesses who, if they have to pay X dollars for a BDS service, but they can get cable with on-demand service, at 50% they'll forego the BDS. What's your response to that? And they seem to have statistics that back that position up. I agree with everything you say until the last part, your honor. That's a second prong, but the fatal flaw with that test is that, as you say, the commission recognizes that BDS includes guaranteed speeds, requires guaranteed speeds, it does not cover best efforts cable services like we might buy in our homes, and yet, under this prong, it counts cable providers as real competitors, even if they don't provide BDS and don't provide, don't even plan to provide BDS, they do have, they do note, despite the fact that they can see it's a separate product market, that well, some, some, some, some companies will, will use the best effort service just because it costs so much less. That can't justify the rule they adopted, which we showed that the low, the low bandwidth market is at the, is 50 megabits per second or lower. It might even be higher than that, but the dispute today, the dividing line is 50 or lower. The cable operators say that the services that the FCC is relying upon never exceed 10 megabits per second. In addition to that, they can only offer a limited amount of that service without cannibalizing their cable video service. They also note, of course, that they don't guarantee the speeds, so if you go to a business and, you know, all their, complain that their credit cards aren't working or slow today, maybe they're saving money on BDS, and the cable companies can't upgrade their services to provide fiber services that are guaranteed without having the same hurdles we face, which is that they can do it in the low bandwidth places, but not the high bandwidth places. We think it's absurd to count a company that doesn't offer BDS or plan to offer BDS as a, as a true competitor. If I can step back to the telecom problem for a moment, prong for a moment, the FCC grievously misread the record. It's, when it said, and this is really the linchpin of its position here in paragraph 41, quote, buildouts are common within half a mile of competitors facilities, unquote. Now, if that were true, this would be a very different case. If we could build out to low bandwidth buildings, that would be true. We didn't say that, none of our experts said that, or anything close to that, and it is obviously wrong. As I already said, eighty percent of buildings, eighty-six percent of buildings, are reached only by the ILEC. If buildouts are common, and we've been trying to do this since 1996, when the Telecom Act ended the monopolies, more than fourteen percent of buildings would have competitive facilities, and more than one percent of buildings would have three or more facilities. Is this a, isn't this a prediction, a predictive judgment? In other words, as I understand this, we have this history, but the FCC is making a predictive kind of judgment. Utilizing their expertise, they make a prediction that this can and will occur in the future. But your honor, of course, under motor vehicles, they can't just make conclusory statements like, we expect things to change. They have to explain why they think things are going to change. They haven't done that. Like I say, they have not faced up to the fact that buildouts are not common. If you thought buildouts were common now, a predictive judgment that they'd continue or even increase would be sounder than it is. I'd like to very briefly touch on two other sort of big, big mistakes the Commission made, just so that they're obvious, and then try to save some time for rebuttal. Ethernet facilities are an important part of this. The one point I want to make about that is that the Commission said in paragraph 88 that we argued that we can't extend our legacy networks, but could expand our fiber, our sort of modern networks. Your honor, we only have modern networks. We came to the party after the legacy networks. We want at least the legacy networks, but the FCC just thoroughly misunderstood that. And I'd also like to make a similar point about transport. We put a chart on page 32 of our of our brief, and the main thing I'd like to say about it is it shows you where we need interoffice transport. We need interoffice transport from an ILEC end office. The channel terminations, the last last mile piece, goes from the business customer to the ILEC end office. That's where we need, we typically need to go to another ILEC end office, but the FCC's test does not look at ILEC end offices. They talk about fiber going from the customer location to other places. Sort of an embarrassing error, your honor. Thank you. Mr. Hanser. All right, you may proceed. May it please the court, Russell Hanser for petitioners CenturyLink and Citizens Telecommunications of Minnesota. I'd like to reserve one minute of my time. Our appeal is narrow, and it turns on basic administrative law. The FCC correctly decided the great majority of the issues before it, but its decision regarding the X factor, which is a critical element of the price cap system, was based on a decisive procedural error. Specifically, the FCC wrongly decided that it could not make necessary adjustments to the X factor based on its incorrect belief that the record lacked any evidence allowing it to do so. Our appeal does not turn on the intricacies of rate making, and unlike Mr. Wright's clients, we are not asking this court to substitute its judgment for the FCC's. Instead, our appeal turns on a simple principle of a specific flaw problem, and the record contains evidence proposing a solution to that problem. The agency has to acknowledge and contend with that evidence. It might ultimately reject the evidence, but it must at least explain why. It cannot simply deny that the evidence exists, and on that basis decline to address the defect it has recognized in its framework. That's reversible error. But it's also exactly what the FCC did with regard to the X factor. It agreed with us that the figures it computed were likely to the record, and on that basis it declined to do so. In fact, the record contained various studies that did just this, including several authored by Dr. Mark Shankerman, which the petitioners here submitted. These studies were discussed extensively in the record, and received attention at the agency's highest levels. In fact, pages 852 to 854 of the joint appendix describe meetings in which Dr. Shankerman came to Washington and explained his proposal for federal counsel, its chief economist, and the chief of the bureau responsible for this rulemaking, among others. The respondents' three main rejoinders all fail. First, they observe, as we did, that the order on review actually cited Dr. Shankerman's studies multiple times. That is true, but it's irrelevant, because the order only cited the studies with regard to other issues. It never acknowledged, and in fact it expressly denied, that Dr. Shankerman or anyone else had proposed specific ways of adjusting the X factor downward. Second, respondents suggest that the FCC's error was harmless, because Dr. Shankerman only addressed the 2011 to 2014 time frame, which the FCC found was too short to be a reliable basis for the X factor. That's just false. As we noted in our reply brief, Centralink submitted analyses by Dr. Shankerman covering six distinct time periods, going all the way back to 2006, and each of those periods produced an X factor well below 2.0%. Third, the respondents contend that petitioners can't challenge the 2% X factor, because Centralink, during the proceeding, at one point proposed a broad compromise to resolve the entire rulemaking that included an X factor in that range. That's also wrong. First off, petitioner citizens did not submit or sign on to that compromise at all, and can't be held to its terms. Moreover, Centralink made clear that it did not believe any single aspect of the proposal would, on its own, be appropriate or lawful. It was a package deal. The order on review actually rejected many of the aspects of the proposal that were favorable to Centralink. Certainly, Centralink can't be held to the concessions it was willing to make when it has been denied the proposal's more favorable terms. Respondents' other arguments also fall flat. They emphasize that the FCC was only required to do the best it could with the evidence before it. We agree entirely, but this is not a case like APCC or USTA, which they cite, in which the FCC actually reviewed the record evidence and found it wanting. Instead, this is a case where the FCC, by its own admission, overlooked the key evidence entirely. Rather than working with the evidence before it, the FCC claimed it didn't exist. There's also no merit to the claim that the FCC addressed any concern by picking an X factor in the middle of the range of four figures it had computed. Each of those four X factors in the range was based on the same problematic data set, and suffered from the same problem, and thus each was too high. Choosing the midpoint from the wrong range of results does not solve the problem. Counsel, I have a question regarding your study that recommended an X factor of less than 2%. Did that study include the company-specific input, price, and output data that the FCC said it needed in the BDS order? So, Your Honor, what we call Shankerman 1, the first of the maiden reports, went through data supplied by Centralink to produce the specific X data in that sense. At a high level, as the order goes through in some depth, and as the reports go through in some depth, you don't want to get too company specific when you choose an X factor, because the point of the X factor is to provide incentives for companies to be as efficient as one might expect a company in that industry to be. So if you have an inefficient company, you don't want its inefficiency to become a cushion for it to not innovate along the way. But it did rely some on the Centralink-specific data on that point. So, in short, the FCC correctly found that the X factor it chose was likely to overstay productivity. The mistake it made was in denying there was record evidence allowing it to adjust the X factor appropriately and using that claim to justify its decision not to make such an adjustment. Its failure to acknowledge the relevant evidence and to grapple with it was a reversal error. If there are no questions, I'll come back for rebuttal. Thank you. Good morning. You may proceed. Thank you, Your Honors. Matthew Dunn for the respondents, the FCC, and the United States. In this rulemaking based on a large and complex record, the FCC found the BDS market is increasingly competitive. The agency found that many, though not all, segments of that market are competitive today. Those segments are higher bandwidth services, packet-based services, and transport. In the market for lower bandwidth legacy technology services, what we're calling DSN lines, the agency found that many but not all segments are competitive and made that finding through this competitive market test we've already been discussing this morning. That test is based on two findings in the record about where the competition is here. The first prong of the test looks for nearby BDS competitors of any type, and the second prong looks for cable operators whose explosive growth in recent years is the biggest change to the BDS market. So both of those findings are well-grounded in the record, and I'll be happy to move on and talk about that record shortly. But first, I just want to make two points. In reviewing the agency's action, I think the Court should keep in mind first that the agency here made this policy call keenly aware of the potential costs of over-regulation through ex-ante price setting. Especially in a rapidly evolving market like this one, it's difficult to get the price right, and when an agency gets the price wrong, there's serious costs. That's chiefly inhibiting investment in this transition from the legacy copper network that we find all over to tomorrow's fiber network. The second point I would encourage the Court to keep in mind that even areas that are no longer subject to ex-ante price caps are still regulated. Those providers are still subject to Section 201 of the Act, which requires that rates be just and reasonable. And if a customer feels that their provider is not keeping up that end of the bargain, they can come to the agency and bring a complaint under Section 208. The ad hoc court that we cite here, the D.C. Circuit, in reviewing a previous portion of this long-term deregulatory effort, found that that Section 208 complaint process was an important backstop, and we feel that the same is true today. I had a question about that too. Sure. Saying you have a right to bring a lawsuit does not necessarily, to me, imply that you have an effective backstop. It may be a backstop, but we're talking about services that may be hundreds or thousands of dollars in overcharges, and you're saying you can bring lawsuits that are going to cost tens of thousands of dollars. How effective is the 208? How often are 208 complaints filed? In this context, this is a new regime, so they haven't been found yet. Historically, how many? Under any segment, I couldn't say in the SEC, but we cite some in our record that they are brought. But you also said previously that they're rare and unusual. I think it is fairly rare that these have to be brought. Of course, that also may indicate that the existing regime is working well, where customers don't need to bring these. But what I would say is that they certainly have been brought. Here, there are not standards yet, because this is a new regime, but it's not uncommon for the standards to emerge through adjudication. I think the most likely scenario here, the Commission hasn't spoken directly to this, but just based on the way this has worked in other segments of the market, is that a motivated customer, a large, sophisticated customer, the ad hoc court talks about this, that these are often large, sophisticated customers, might bring a test case and might say, we are paying this rate here, and we pay to the same provider in a different area nearby a different rate, and those seem to be substantially similar. There's no reason to charge different rates. There will probably be a battle of experts about whether or not the contracts are actually similar, but I think they do have a path forward. And the ad hoc court specifically found, of course, that these would be motivated parties likely to bring it, to take advantage of that backstop. But of course, it is only a backstop because the agency has found that the rates in the areas that are no longer subject to price, the ex ante price gap, that there is competition already. So I'll just quickly go over a couple of points there in response to the discussion we've had already today. I can start with the second prong with cable, because I believe Your Honor had a question about that. So I hope we explained in our brief, there are three avenues along which cable can compete. And I'll just list them, and then I'll explain them EOHFC and TrueBDS. I believe Your Honor's question was about Best Efforts Cable. So it's true that the agency found that Best Efforts Cable, which doesn't provide particular service guarantees, is not the same product as BDS, because BDS, a big part of that product is service guarantees. That being said, the agency also found... Let's see, we could look in 31 of the order, that it's not a perfect substitute for all customers, but it is a substitute for many customers, and that there's record evidence that incumbents are losing business already to cable best efforts service. So certainly in that sense, it is providing competitive pressure, even if it's not a substitute for all customers in all instances. The second way in which cable competes is BDS service or BDS-like service over its existing network, which is EOHFC, which is a hybrid. to the customer. The agency's finding there is this hybrid fiber copper network on the ground today gives a leg up to providers to run that last bit of fiber all the way to the premises, and that's full service guarantees and high bandwidths. And there's record evidence that this is a significant factor for the cable providers. And I think the most telling evidence is that we can talk about the theoretical considerations of whether or not cable providers can compete, but the record says that they are competing. So there are significant losses from incumbents to cable, including at lower bandwidths. Some of the specific numbers are confidential, but they're in our brief, but AT&T and Verizon, major ILACs are saying that they have substantial losses already to cable, and cable's growing something like 20% year over year. So I'll just say briefly about the half mile test. As we cite in our brief, there is evidence that even at lower bandwidths, competitive providers are competing. I'll point to page 47 of our brief, which it just is one instance, discusses a competitive carrier that has a substantial portion. The numbers are confidential, so I won't say them in court, but you can read them. A substantial portion of their low bandwidth is only half a mile. And the commission also discussed strategies that providers use, such as aggregating customers by building a circuitous route. So instead of running one line half a mile, they're gonna run a little bit more than half a mile and try and swoop in extra customers. And that's discussed in our brief, of course, also. The last thing I would say is that... Can I ask you a question? Yes, please. It seems to me that a lot of this is based on prediction, correct? Absolutely. And so, not surprisingly, you have history as some indicator of what the future is gonna hold. But is there another element of evidence that the FCC considered in addition to what now exists and what the history is that informed this prediction about the future? And I'm thinking about expert evidence, experts in the field who have studied the industry and are ready to make... Give an expert opinion as to the trajectory of this competition. There are certainly battling experts, including experts finding and predicting robust competition. But I think to answer John's question, certainly the FCC is shooting at a moving target here. And what the agency discusses is that this is a market of accelerating competition, especially in cable, where this growth has been explosive in recent years, but also to some extent across all segments. And the agency says at several points in the order, when price setting, it's particularly difficult to get a price right when the market is changing. Again, that's the moving target that you're shooting at. So the particularly high cost to setting the wrong price in an evolving market, and that's certainly something that's on the agency's mind here. Counselor, could you address the notice issue with regard to ending the ex ante regulation of transport services? Transport services particularly? Sure. So much of transport was already free from ex ante regulation, as we discussed in our brief. But if we look at the NPRM... Let me just get this in front of me. So I'm gonna start at... Excuse me. Paragraph 281 of the NPRM. That would be the segment where the... What page are you... Oh, I'm sorry. It would be JA349. We hear that agency begins by discussing the regime in place already at the time that this order was passed, or that the NPRM came out, excuse me. And the agency says, up until now, we've been regulating transport separately from vertical channel termination. And the logic behind doing that, there's also this last sentence of this paragraph, looking at how non cable competitive LECs have deployed their networks. We find this approach holds true today for these types of providers. In other words, that there's still some separation in the market between these two approaches. And then to be sure, the agency at that time was considering regulating transport and competitive... Excuse me, and channel terminations together. That was the proposal on the table. However, the agency was open minded about other approaches. So in paragraph 284, the first sentence is, we seek comment on whether to apply our competitive market test based on different BDS customer classes at varying bandwidths, and ask for comment on whether, and if so, how the commission should separate the product market by customer type and bandwidth. There the agency is saying, should we regulate differently based on what the product is? How could interested parties make informed comments if they didn't know that this was going to be eliminated entirely? I would just say that they did make informed comments. The record is full of ample debate about transport, so that I think the parties which were watching this knew that this was on the table.  Page 37 of the order. So paragraph 78 begins, commenters, this is discussing transport. Commenters, including competitive providers, support maintaining this distinction, distinction regulating transport and channel terminations. And then there's a footnote, and it cites lots of commenters, including competitive providers. So there was robust debate about how transport should be regulated, including whether it should be regulated separately from channel terminations. But is there... Can you point to anywhere in the notice that suggests that the FCC was considering completely deregulating inter office transport? Well, Your Honor, I, of course, dispute that we're completely deregulating, but shifting the mode of regulation from ex ante to ex post. Again, well, the sections I was reading, I think it read fairly in context what the agency is saying, is this is how we're planning to treat this market. What do you think? Should we do it differently? And clearly, parties did comment on that. If you look... And we think that this is pretty analogous to other cases that we've cited. This court's case, Goldschmidt, Northwest Airlines versus Goldschmidt, I think is a very open ended proposal was on the table there, where the agency didn't even give a specific proposal, and this court found, as the APA requires, that if the subject is teed up, and then the court sees robust discussion on an issue, as it did in that case, and as we do here, that notice has been adequate. I guess I'm almost out of time, so I would just say quickly on the X factor, unless Your Honors have other questions about these prongs that we've discussed so far. I guess the single point I would push back on most strongly is that the agency agreed with the X factor petitioners here, that the data range that was selected was clearly skewed for too high an X factor. So the agency does say at one point, we think an upward bias is more likely, but then said, we're unable to resolve the dispute among the parties as to whether the scope creates an upward or downward bias, and then says, our inability on the record before us to quantify the magnitude or direction supports selecting the point that we have. So it's true that the agency said, it seems most likely to us that the data is skewing in this direction. However, the agency says several times as we cite in our brief, but we can't be sure, and we're not gonna make an adjustment based on that kind of uncertainty, and I think that's at a minimum reasonable in the rate making context where the court owes considerable discretion to the agency. Before you conclude, let me ask one kind of a logistical, I guess, question or procedural question. It's my understanding that this order was available at some point for review. That's right. Is that correct? That's correct. And physically, what would a person or an entity have to do, have had to do to review the order? Where was it? I know it wasn't promulgated... It wasn't... Out there. What... Right. Would you have to go to the FCC headquarters to review it? No, it was available electronically in the docket, I believe is the case of the parties following this rule making. And of course, as we point out, petitioners here obviously did have access to that, because there was considerable back and forth in that time period. It's not published in the Federal Register because the time period is so short, but it is available electronically from the agency. This is a new initiative that the agency has been undertaking. In the interest of transparency generally, it's not particular to this rule making. It's an ongoing effort, but this was one of the first cases where the agency did that. And so who learns of the availability of it, and how is the order? The public is notified by checking... In some cases, there's a public notice also. I'm not sure if that's the case here. Maybe other parties can speak to that. I know that it's available in the docket, and in these big rule makings, sophisticated regulatory attorneys are monitoring this very closely. It's true that my mother in Tennessee is probably not aware of it. You'd have to be checking the docket every day, but parties that are interested in this seem to have been aware of it since they were able to comment on it. And again, we don't suggest that this is a substitute for APA notice in the Federal Register. It's just a point to keep in mind. It's an additional transparency effort. Well, it was raised in the briefing there, wasn't it? Sure. I think it's relevant as a point, especially as to harmless error. We certainly disagree that notice was inadequate, but if there were inadequate notice, this was an additional means by which parties could offer comment, and they took advantage of it. And what's the time period? It's about... It's three weeks before the order comes out, and then a week before the order is voted on, there's a sunshine period when there can no longer be comment. So it's effectively a two week period. If there are no further questions. Thank you very much. Councilor, you may proceed. Good morning. I'm John Nectarline, representing AT&T and US Telecom in support of the FCC. Before I turn to the broader issues, I quickly want to address notice, because there were a number of issues raised with respect to that. There are two questions with notice. One is, was the issue, as opposed to a proposal, adequately teed up? We know that that's a disjunctive test under the APA, the DC Circuit case, Nuvio quotes available precedent for that point. And in this case, the FCC did make it clear that all aspects of BDS were on the table. And of course, this order comes against the backdrop of a very substantial removal of price controls for transport throughout the country. So if the competitors, in this case, had wished to reimpose price controls, the burden was really on them to raise that. Now, I now wanna turn not just to the question of whether there was adequate notice, but to the question of prejudice, because that is also a required showing. Courts of Appeals don't sit to call harmless error fouls. And in this case, there was extremely robust back and forth about the topic of transport throughout the proceeding, and not just in the last weeks, once the FCC as part of this broader transparency initiative published the draft order, but also in the fall of 2016, back when the old regime at the FCC was still there, they proposed massive re regulation of transport. And if you look at the joint appendix at pages 1026 to 27, and then joint appendix at 1061, you'll see a very granular and detailed exchange between my clients and Mr. Wright's clients about whether transport should be re regulated, deregulated and so forth. Our clients took the position that transport should be subject to no price controls throughout the country. That, of course, is the position that the FCC ultimately took. Mr. Wright's clients supported the outgoing administration's proposal to re regulate transport in that respect. There is nothing that the competitors have identified that they would have raised, in addition to all of these points that they raised both in the fall of 2016, and then later in the spring of 2017 about transport. I would submit that this rule making proceeding has been going on for a very long time. It has been accompanied over the last 20 years with a, from my client's perspective, a rather slow process of regulatory relaxation. And there is substantial evidence in the record to support everything that the Commission did with respect to competition for low bandwidth services. We cite the relevant passages in our brief at pages 26 to 27. The FCC, in its brief, cites additional passages in the order as well. With respect to cable, as Mr. Dunn pointed out, there are three different types of cable services that are offered to satisfy the demands of business customers. All three are in play here. With respect to Ethernet over HFC, both, as the Commission pointed out, my clients, AT&T and also Verizon, and indeed one of Mr. Wright's clients, Sprint, purchase Ethernet over HFC where they compete out of region. I think in conclusion, I would add that the question here, whenever the FCC addresses a complex record like this with the need for extensive line drawing, is not whether it produced perfect competitive outcomes everywhere. That is an impossibility. The question instead is whether the FCC reasonably balanced all the considerations on the table. And those include not just the need to ensure prescriptive regulation where it's needed, but also to ensure that price controls don't deter investment in innovation. And Exhibit A for that is the cable industry's brief. As they explained in their brief, they don't want my clients, the ILECs, to be subject to price controls because when we are, it deters them from building out to these locations. And you hear a lot about how there's not a lot of competition for certain locations. Well, part of the reason for that is that there are price controls in effect today. And if I am a competitive business, I would much rather buy somebody else's service at low regulated rates and then compete with that person under those regulated rates rather than deploy my own facilities. The only way you get facilities investment is to remove ex-ante prescriptive regulation. Thank you. Thank you, counsel. How much time does Mr. Wright have? Thank you, Your Honors. Judge Moy, Section 208 is indeed a mirage. And I'd note that Chairman Pai described it as a safety valve. And Judge Bork, in the Altel case we cite from the D.C. Circuit, noted that safety valves, quote, can't save an irrational rule, unquote. And this is an irrational rule. He added that otherwise no rule, however rational, could be struck down as long as there was a waiver process or some other sort of safety valve. And it's also a mirage because the Commission has made decisions here that nearby potential competitors restrain prices and do it countywide. If we come in and say we think a price is too high, they will say, well, are you seeking to buy BDS in a county that we've determined is subject to effective competition on account of nearby potential competitors? And if we say yes, they can decide it in five minutes, not just five months, they just stay up to night on it. If we were to try to say, well, we think their cost, their rate of return is too high, the FCC would laugh us out of the Commission. They don't care about that. And they don't require the ILACs to collect the data anymore by which we could prove that. I'd welcome any questions about anything else the respondents and their intervener had to say. I guess not. Thank you, Your Honor. And Mr. Hansard, I think he has a little time. Why don't you take all of a minute if you want. Thank you, Your Honor. Thank you. So, Your Honor, I just want to respond briefly to the FCC's argument that it was more ambivalent than we suggest about whether the X factor was likely to overstate productivity. It's not just that the FCC said that the X factor would like, the range of X factors would likely overstate productivity. The FCC also affirmatively agreed with us on the substance as to why, in particular with respect to the declining utilization and economies of scale. So I thought it might just read to you from paragraph 229 of the order, which is at JA 1218-19, talks about some of the reasons why. It says, as a result, price cap LECs, that's us, are likely experiencing very low utilization on their legacy TDM switches, that's the services at issue, and the accompanying loss of scale economies suggest it is unlikely price cap LECs have achieved productivity gains that are in excess of inflation for DS-1 and DS-3 services. Again, the service is subject to price gaps. The declining utilization of DSN-specific plant means that providers must amortize shared costs among fewer customers, i.e., unit costs are likely rising. It therefore appears that for DS-1 and DS-3 services generally, price cap LECs operating expenses may have fallen at a much slower rate than the demand for their services, causing their average cost of providing DSN services to steadily climb. We respectfully suggest that that's not ambivalence, Your Honor. That's an agreement that the price factor, sorry, that the X factor is going to overstate productivity. Thank you very much. All right. Counsel, thank you very much. We appreciate your arguments. The case is submitted.